UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

CHERYL RICH,                                    )
                                               )
        *Plaintiff*,                           )
                                               )
v.                                             )        No. 1:08cv35
                                               )        *Edgar*
TIMOTHY A. GOBBLE, individually                )
and in his official capacity as Sheriff        )
of Bradley County, Tennessee                   )
                                               )
        *Defendant.*                           )

**MEMORANDUM**

        Plaintiff Cheryl Rich brings this action claiming that Defendant Timothy A. Gobble,

individually and in his official capacity, retaliated against her in violation of her First

Amendment rights and in violation of Tennessee law.  [Court Doc. No. 1, Complaint].  She

brings her First Amendment retaliation claim pursuant to 42 U.S.C. § 1983 and seeks equitable

relief, as well as compensatory and punitive damages.  Defendant Gobble has filed a motion for

summary judgment seeking dismissal of the claims against him.  [Court Doc. No. 31].  Plaintiff

opposes the motion for summary judgment.  [Court Doc. No. 36].

        In addition to the motion for summary judgment, Plaintiff and Defendant have filed a

number of ancillary motions.  [Court Doc. Nos. 37, 39, 40, 41, 42, 43, 52].  Plaintiff seeks

permission to file a response brief in excess of twenty-five pages.  [Court Doc. No. 37].  The

court has considered Plaintiff's request and has determined that Plaintiff's motion to file excess

pages will be **GRANTED**.  Defendant has also filed motions to strike portions of the affidavits

filed by Plaintiff in response to his motion for summary judgment, as well as motions for leave

to file an amended answer and a motion to dismiss. [Court Doc. Nos. 39, 40, 41, 42, 43]. Plaintiff has also filed a motion to amend her complaint. [Court Doc. No. 52]. The court has considered each of these motions separately and will discuss each below.

The court has reviewed the admissible evidence in the record, the arguments of the parties, and the applicable law and has determined that Defendant's motion for summary judgment will be **DENIED**.

## I. Background

The parties dispute many of the material facts in this matter; however, because Defendant has moved for summary judgment, the court must view the facts in the light most favorable to the Plaintiff. Therefore, the facts viewed in such a light are as follows. Where there are significant disagreements regarding the material facts, the court will note the areas of dispute.

In August of 2006, the voters of Bradley County, Tennessee elected Defendant Gobble to the office of Sheriff of Bradley County. Complaint, ¶ 6. In his Answer to the Complaint, Defendant asserts that as Sheriff he "acted under color of law and the customs and useages of the State of Tennessee and was the final and highest decision maker in the establishment, formulation and implementation of policies and customs for the Bradley County Sheriff's Office." [Court Doc. No. 2, VIII ¶¶ 3-4, Answer]. Defendant assumed the duties of his office on September 1, 2006. Complaint, ¶ 6.

Following his election to office, Defendant interviewed and hired Plaintiff for the position of Director of Finance and Administration for the Sheriff's Office with an annual salary of $55,000.00. Complaint, ¶ 7. Plaintiff's prior education and work experience included graduating magna cum laude with a bachelor's degree in Organizational Management, and she

had worked as a contract employee with the United States Department of Justice and with Life Care Centers of America. *Id.* at ¶ 5. Plaintiff began working for the Bradley County Sheriff's Department on September 1, 2006. *Id.* at ¶ 8. The parties appear to disagree regarding the exact scope of Plaintiff's job duties. Defendant asserted in his deposition that the position was "[a]dministration and finance-related, helping with the budget, the secretaries that are answering the phone, records maintaining, those type of things. That was fluid in the sense I had not taken office and didn't know all the various aspects of what this job would entail either." [Court Doc. Nos. 31-2, 36-7, Deposition of Timothy A. Gobble ("Gobble Dep."), p. 68]. Plaintiff explained her duties as being the "administrative and financial director over the administration department." [Court Doc. Nos. 31-4, 36-1 Deposition of Cheryl Rich ("Rich Dep."), p. 37]. Defendant told Plaintiff that she would be in charge of grants, budgets, payroll, the reception area, and benefits. *Id.* Plaintiff also understood that the position involved personnel supervision and human resources. *Id.* at 38. However, she did not interview job applicants; the person handling payroll did, and the Defendant had the final decision regarding hiring and firing. *Id.* at 39-40. Plaintiff may have had responsibility for interviewing an applicant in her department if the Defendant approved the filling of a position within that department. *Id.* at 41-42.

Plaintiff asserts that prior to her employment, Defendant stated to her that the job of Sheriff did not pay a lot of money and that he needed more money because he used to make over one hundred thousand dollars at the Secret Service. Rich Dep., pp. 44-5. Plaintiff further contends that at some point in time, Defendant told her that he wanted to hire his wife in the Sheriff's Department to supplement the family income with her $20,000 salary. *Id.* at 51-52. Defendant disagrees with Plaintiff's version of the events; however, as stated *supra*, this court

-3-

must view the facts in the light most favorable to the Plaintiff.

From the beginning of Plaintiff's employment, the parties dispute the nature of the events leading to Plaintiff's ultimate termination of employment the following March of 2007. Plaintiff claims that Defendant initially informed her that she was doing a "good job," but that his attitude towards her changed once she began raising questions regarding his use of the budget, as well as his hiring of his wife. Plaintiff claims that Defendant praised her work on a number of occasions. [Court Doc. No. 36-2, First Affidavit of Plaintiff ("Rich Aff."), ¶ 3]. Defendant, in contrast, claims that "[s]oon after her employment began, I began to have problems with Ms. Rich questioning my management decisions. Ms. Rich questioned and opposed everything from the type of printers that the office should use to the types of weapons the deputies should carry. Ms. Rich even displayed an improper attitude and opposition to who I hired as my staff." [Court Doc. No. 31-1, ¶ 4, Affidavit of Timothy A. Gobble ("Gobble Aff.")].

The problems with Plaintiff's employment appear to begin in earnest when she questioned Defendant's hiring of his wife for a vaguely-described position. The record appears to suggest that Defendant's wife was going to work directly for the Defendant as a kind of assistant to the Defendant's assistant. In October 2006, the Defendant discussed hiring his wife with the Plaintiff. Rich Dep., pp. 52-53. Plaintiff asserts that Defendant initially wanted to pay his wife $20 per hour, and Plaintiff informed him that no part-time employees made that much money at the Bradley County Sheriff's Office. *Id.* Plaintiff further contends that she wanted the Defendant to "understand that I didn't think it was a good idea" to hire his wife, without being disrespectful. *Id.* at 54. Following their conversations, Plaintiff alleges that Defendant simply told Plaintiff to find his wife a job. *Id.* at 55. Plaintiff then informed Defendant that her assistant

had found an opening at the Court Services Office for which his wife might be qualifed. *Id.*
Defendant responded that the proposed position was not appropriate because his wife "needed to
be more flexible in her hours." *Id.* at 56.

Following these events, an employee in the finance and administration department
resigned from her position in November of 2006. Rich Dep., p. 56. The employee's resignation
followed the employee being placed on administrative leave for submitting falsified time sheets
to payroll and receiving pay for time that she did not work. *Id.* at 59. Following her resignation,
instead of hiring a replacement, the other employees in the finance and administration
department split the prior worker's duties. *Id.* Defendant decided not to fill the empty position
in the finance and administration department, but instead determined to hire his wife. *Id.* at 69-
70. Plaintiff learned that Defendant's wife would be working "in administration to help Jennifer
Johnson, [Defendant's] executive assistant." *Id.* at 70. Defendant did not need to obtain
Plaintiff's approval to hire his wife. *Id.* at 71. The Defendant asked Plaintiff to make his wife an
"exempt" employee "so she could come and go as she needed to." *Id.* at 71-72.

Plaintiff's affidavit describes the situation as follows:

> After the Sheriff hired his wife, he informed me she would report directly
> to him and would not perform the duties of the vacant position in Finance and
> Administration as they previously existed. This violated the County's nepotism
> policy. . . . I did tell the Sheriff I thought it was a bad idea for him to hire his wife,
> because I thought it looked terrible politically and because his wife's application
> showed she was not qualified for the job. I did this in a respectful and objective
> way. But, once the decision was made, I accepted it and moved on because it was
> ultimately the Sheriff's decision.
>
> The Sheriff directed me to classify his wife as an "exempt employee" so
> she could "come and go from the office as she desired" and draw her salary
> irregardless of whether she worked at the Sheriff's Office during normal working
> hours.
> I respectfully tried to tell the Sheriff this was a bad idea and would violate

federal labor law, in part because the salary was too low and showed the Sheriff the applicable provisions of the law.

The Sheriff told me "that's federal and doesn't apply to me". I told him federal law applies to "everyone, including you". He then told me he would raise his wife's salary to the legal limit for exempt employees and hire his wife anyway.

The Sheriff's wife's starting pay was higher than any other clerical employee of the Sheriff's Office, other than supervisors and his Executive Assistant, even though her application demonstrated she had never been employed outside the home.

I reported to the Sheriff that his wife and Executive Assistant were not properly turning in leave request forms and did not appear to be working the required amount of time per week and he responded he could do anything he wanted with "my people" and "what does it matter a few hours here or there".

Rich Aff., ¶¶ 5-10.

The employment application of Christie Gobble, Defendant's wife, reveals that she had received no education beyond her high school diploma and that she had not worked outside of the home at any time in the ten years prior to the date of the application.[1] She listed "N/A" on the portion of the application that indicated work history. *Id.* Ms. Gobble also failed to provide any written communications sample and left this entire portion of the application blank. *Id.*

The record indicates that Bradley County maintained a policy entitled "Personal Relationships in the Workplace." [Court Doc. No. 36-7, p. 11]. The policy states:

Each elected official determines the policy for personal relationships to be followed for his/her department. However, in the absence of a specific departmental policy the following policy will apply. . . .

---

[1] Defendant has moved to strike significant portions of Plaintiff's affidavit and the exhibits attached thereto. [Court Doc. No. 39]. As discussed *infra*, the court will **DENY** Defendant's motion to strike. Therefore, the court relies on information from Plaintiff's affidavit, as well as exhibits attached to Plaintiff's affidavit.

The employment of relatives or individuals involved in a dating relationship in the same area of an organization may cause serious conflicts and problems with favoritism and employee morale. In addition to claims of partiality in treatment at work, personal conflicts from outside the work environment can be carried over into day-to-day working relationships. . . .

Relatives of current employees may not occupy a position that will be working directly for or supervising their relative.

*Id.* Defendant asserted in his deposition that he had a different policy than the standard Bradley County policy; however, there is no evidence in the record of a different written personal relationship policy in effect for Defendant's office. Gobble Dep., pp. 200-203. In maintaining that he had a different policy even though it was not in writing, Defendant stated, "I don't think there's anything wrong with the sheriff setting policy, whether it's written or unwritten, if that is what promotes the mission and the effective and efficient operation of the Sheriff's Office. You don't necessarily have to revoke something in writing or put something in writing for it to be your policy or practice." Gobble Dep., p. 201.

Defendant's version of the events in question is that "Ms. Rich began to create conflicts with other employees in the office." Gobble Aff., ¶ 5. Sheriff Gobble does not dispute the fact that he hired his wife to work for him. Nor does he dispute Plaintiff's assertion of the salary amount he paid his wife and her exempt status pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*. He asserted in his deposition that other husbands and wives employed by Bradley County worked together. Gobble Dep., p. 201. In discussing Plaintiff's employment, Defendant indicated that her job performance was "inadequate" and that she had "several run-ins with the administrative staff." *Id.* at p. 101. When asked about her job performance in the first month of her employment, Defendant responded that he could not "put an exact date on those confrontations" that Plaintiff allegedly had with staff and that he was "not

-7-

exactly sure when they occurred." *Id.* Defendant asserts that "[t]here were times almost from the beginning where she exhibited some what I felt to be attitudes around the office that were not conducive to an effective and efficient run office in an office environment, and that progressively got worse through her employment. Started out relatively small." *Id.* at 102.

Although Defendant cannot remember if his problems with Plaintiff's employment began before or after she raised questions about his wife's employment, he does assert that her attitude "hampered the efficiency and harmony within the office." Gobble Dep., p. 102. He suggests that Plaintiff demonstrated a poor attitude towards Chief Bill Dyer and that Plaintiff confronted his secretary regarding her use of office cellular telephones. *Id.* at pp. 102-03.

Plaintiff's version of the events is, not surprisingly, different. She asserts that "[o]ver time, as I began questioning and raising concerns about the Sheriff's misconduct, the Sheriff's attitude toward me changed from being friendly and engaging to being aloof, distant, angry and unfriendly." Rich Aff., ¶ 4. The parties agree that Plaintiff raised various issues of varying importance regarding the Defendant's requests for spending and Defendant's use of County funds.

One example that caused friction between the parties was the Defendant's request for a dedicated printer for his wife so that she could "properly do [Defendant's] letters and print those letters in the office." Gobble Dep., p. 103. Defendant claims that Plaintiff provided "one excuse after another as to why that printer could not be installed" and "exhibited an attitude regarding that and disfavor about getting the printer installed." *Id.* Defendant notes that the printer installation was "at his request" and that he was "displeased with her performance regarding that." *Id.* Plaintiff's version of the printer incident varies from Defendant's version. She asserts

-8-

that the Defendant specifically instructed her to find ways to make the office more efficient. Rich Aff., ¶ 25. Plaintiff asserts that she immediately noticed that "monthly expenses for ink printer cartridges" were "up to $2,500.00." *Id.* She discovered that the "expenses were so high because the computers were not networked, but each computer had a stand alone printer." *Id.* Plaintiff created a system that "networked the computers to copy machines" and which "should have resulted in significant savings to the County." *Id.* The Defendant allegedly approved the new system, but then requested that his wife be allowed to have her own stand-alone printer, "even though there was a networked printer/copier right outside her door." *Id.* Plaintiff asserts that:

> I respectfully told the Sheriff this would cause a sharp increase in printing costs, but he said do it anyway. I did question this decision and I did personally oppose it. I questioned and opposed it respectfully, but once the decision was made, I accepted it, and moved on. I deny there was anything improper or inappropriate in what I did and I deny there were continuous confrontations about these matters.

*Id.*

The printer confrontation was only one of many ongoing disputes between Plaintiff and Defendant. For instance, Plaintiff objected to the Defendant's spending on certain items, such as a more expensive handgun for himself and other items for his personal use on the job, that were not in the budget. *See* Rich Aff., ¶ 12; Rich Dep., p. 104-105. Plaintiff asserts that she "warned the Sheriff on a number of occasions that his spending was outside the line item budget and would require significant budget adjustments, but he continually directed me to "'find the money.'" Rich Aff., ¶ 12. Defendant maintains that Plaintiff had:

> [j]ust a general attitude of questioning legitimate management decisions regarding policy such as decisions on equipment purchases and other things that were out of the scope of her employment duties to make. It wasn't her job to make those decisions.

Her job was the mechanics of making that type of thing happen. If a decision was made to purchase a weapon, purchase whatever it might be, the mechanics of it was to get the purchase order ready, submit the paperwork to the Mayor's Office to get the bill paid, not to question the decisions. And that was a continual problem almost from the beginning forward to the end of questioning things that were outside the scope of her employment.

Gobble Dep., pp. 103-104.

The parties experienced another significant confrontation over the Sheriff's use of

County credit cards. Plaintiff describes the situation as follows:

In approximately December, 2006, the Sheriff directed me to apply to the Bank of Cleveland, where his brother worked, for a credit card in the name of the Bradley County Sheriff's Office without notifying the County Mayor's Office. I did this, although I was not sure it was appropriate. After applying for the card, I researched the issue and discussed it with other county employees in the Mayor's office and determined that the Sheriff was not authorized to obtain the credit card without the County Mayor's knowledge and permission. When I learned this, I felt obtaining the unauthorized credit card placed both the Sheriff and myself in a very vulnerable position because obtaining the card clearly violated County policy and was improper. I was also concerned that there had been a public outcry only a couple of months before about the Sheriff's unauthorized use of credit cards and I was frankly concerned that I had been told to and had done something illegal. So with that in mind, I notified the Bank of Cleveland and returned the cards.

Rich Aff., ¶ 14.

Defendant describes the credit card incident as follows:

In December of 2006, I discussed with Chief Deputy Bill Dyer my concerns regarding Ms. Rich and mentioned that I was thinking of terminating Ms. Rich. After discussing his concerns regarding Ms. Rich, Chief Dyer convinced me to give Ms. Rich another chance.

In order to improve office inefficiency created by Ms. Rich, but still allowing her another opportunity to remain employed with the Sheriff's Department, I incorporated a position change for Ms. Rich into a planned reorganization for the Sheriff's department. The change in Ms. Rich's job duties also meant a reduction in her pay.

Within days of learning of her position change and pay reduction, Ms. Rich

-10-

cancelled the Sheriff's department credit cards. I had specifically instructed Ms. Rich to "hang onto" the cards until there was clarification as to county policy regarding whether the cards were authorized.

After her cancellation of the credit cards, I began to worry that Ms. Rich may take other retaliatory action to undermine the Sheriff's department, so I made her position change effective immediately.

During the course of the next month, Ms. Rich's attitude and job performance did not improve.

Gobble Aff., ¶¶ 6-10.

The record includes a copy of the June 30, 2007 Annual Financial Report of Bradley County, Tennessee. [Court Doc. No. 36-2, p. 34]. The report contains a section entitled "Questionable Use of County Credity Cards" under the "Office of Sheriff." *Id.* at p. 16. The finding states:

The county's credit card policy provides that credit cards are to be used for out-of-town travel expenses while any other use should be discouraged. Our review of credit card records of the Sheriff's Department for the year ended June 30, 2007, noted that credit card charges totaling $5,230 were made for office furniture, tear gas, vacuum cleaners, office supplies, items for a job fair, workout tapes, supplies for an open house, and other law enforcement supplies. These purchases were not related to travel expenses and appear to violate the intent of the credit card policy. While we do not question the validity of these purchases, we do believe that these purchases should have been made through the General Fund through the county's normal purchasing process.

*Id.* The Bradley County Mayor also testified in his deposition that Ms. Rich's application for a credit card for the Sheriff's Office was unauthorized. [Court Doc. No. 36-10, Deposition of Gary Davis ("Davis Dep."), p. 12]. He asserted that the bank informed him of the account and he responded that "if there was any billing on it, that it would not be paid because it was an unauthorized credit card . . . ." *Id.*

Around the same time as the credit card incident, Defendant and his wife took a vacation

-11-

to London. Plaintiff asserts that Defendant's wife did not complete a leave request form as other employees were required to do. Rich Aff., ¶ 15. Plaintiff attempted to inform Defendant that his wife failed to submit leave requests for the time spent in London, as well as additional days following her return. *Id.* at ¶ 16. Defendant's wife did not receive pay for her time spent in London, and Plaintiff asserts that "[w]ithin days of finding out his wife had not been paid for the London trip, my informing him of the lack of a proper leave request form from his wife, and my cancelling the unauthorized credit cards, the Sheriff informed me he was merging my division with another, eliminating my position and reducing my annual salary from $55,000.00 to $38,969.00 effective January 26, 2007." Rich Aff., ¶ 17; [Court Doc. No. 36-2, pp. 46-47].

Following the Plaintiff's change of position and reduction in pay, Plaintiff began "keeping records of the Sheriff's misconduct and improper activities." Rich Aff., ¶ 18. On January 21, 2007 Plaintiff provided the Mayor of Bradley County, Gary Davis, with a copy of a memorandum entitled "Indications of Multiple Incidents of Fraud, Waste and Abuse with the Bradley County Sheriff's Office since September 1, 2006" (the "Memo"). *Id.* at ¶ 19. Plaintiff asserts that "[m]y job responsibilities did not include reporting these activities and misconduct to the Mayor's Office, but I felt as a citizen, it was the appropriate and responsible thing to do." *Id.* at ¶ 20. She asserts that two days after she issued the Memo to the Mayor, the Defendant informed her that her salary status had been changed from "exempt" to "nonexempt" under the FLSA. *Id.* at ¶ 22. The Defendant also informed her on February 7, 2007 that she would not be eligible for the four weeks of vacation that she had been told she would have upon the beginning of her employment. *Id.* at ¶ 22.

The Memo consists of nine pages of allegations of various misconduct on the part of

Defendant. [Court Doc. No. 44-4, Memo]. The Memo describes Plaintiff's allegations regarding Defendant's hiring of his wife as an exempt employee. *Id.* It further describes Christie Gobble's failure to use appropriate leave forms. Plaintiff further addressed her allegations of inappropriate budget expenditures, cellular telephone usage, the printer issue, and the unauthorized credit card. She further detailed her allegations regarding the Defendant's alleged expectation that his wife would receive her salary while she was traveling with him in London over the holidays. *Id.* She also described her reduction in pay and transfer to a new position which included placing her "in the smallest room in the administration section with only a desk that is falling apart." *Id.*

On March 8, 2007, Defendant terminated Plaintiff's employment. Defendant describes the events leading to Plaintiff's termination in this manner:

> On March 8, 2007, I received a call from F.B.I. agent Wayne Jackson. Mr. Jackson had conveyed that while in public, Ms. Rich had made numerous derogatory remarks regarding myself and my management decisions which agent Jackson found inappropriate and troublesome. As a result of the phone call from Agent Jackson, I terminated Ms. Rich on March 8, 2007.
>
> Prior to her termination, I was not aware that Ms. Rich had drafted or distributed her "waste, fraud and abuse" memo and was not aware of the specific allegations she had made in the memo.
>
> Prior to her termination, I was not aware of Ms. Rich speaking with anyone in the county government or outside the county government concerning the allegations of the "waste, fraud and abuse" memo.
>
> Had I been aware of the "waste, fraud and abuse memo" I still would have terminated Ms. Rich's employment on March 8, 2007 due to her history of insubordination and inappropriate public comments made in the presence of Agent Jackson.

Gobble Aff., ¶¶ 11-15.

-13-

Plaintiff describes her conversation with Agent Jackson in the following way:[2]

> On February 12, 2007, I had a conversation with Wayne Jackson and Bob Chester at Qdoba Restaurant. Wayne Jackson asked me how things were at the Sheriff's Office. I told them I had been demoted because I was raising issues about the Sheriff hiring his wife at a salary higher than most other clerical employee[s]; raising questions about the Sheriff's wife being paid for work she had not performed; for not paying his wife while she was away on a London trip; and raising issues of credit card misuse. I told Wayne Jackson that morale was bad because of all these problems. We then discussed how the Sheriff was threatening to sue the County for more money and that he was spending money very fast. Wayne Jackson asked what the employees were doing about all this and I told him myself and some other employees were afraid the Sheriff would blame us if someone questioned the expenditures and we were trying to document all this to protect ourselves. . . . I did tell Wayne Jackson that myself and others were documenting the Sheriff's misconduct to protect ourselves, but I deny I told him I was "out to get the Sheriff".

Rich Aff., ¶ 31.

The parties agree that Defendant terminated Plaintiff on March 8, 2007. Plaintiff alleges Defendant stated to her, "It has come to my attention that you do not need to work here anymore. You're gone." Rich Aff., ¶ 24. Plaintiff asserts that Defendant would not say any more about her termination. *Id.* The parties disagree about why Plaintiff was terminated, with Plaintiff alleging Defendant was motivated to terminate her because of her allegations of his misconduct and Defendant asserting that he terminated Plaintiff because of the inappropriate nature of her conversation with Agent Jackson, combined with her history of insubordination.

## II.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is

---

[2] Although Defendant moves to strike this portion of Plaintiff's affidavit, as discussed *infra*, this court will **DENY** the motion to strike.

on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Bailey v. Floyd County*

-15-

*Bd. of Educ.*, 106 F.3d 135, 140 (6th Cir. 1997). If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

## III.    Analysis

### A.    Section 1983

Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. To establish a claim pursuant to Section 1983, a plaintiff must demonstrate two elements: "(1) the defendants deprived [plaintiff] of a right, privilege, or immunity secured to [him] by the United States Constitution or other federal law; and (2) the defendants caused the deprivation while acting under color of state law." *Cunningham v. Sisk*, 2003 WL 23471541, *5 (E.D. Tenn. 2003) (citing *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000)). Section 1983 " 'creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere.' " *Alexander v. Haymon*, 254 F.Supp.2d 820, 830 (S.D. Ohio 2003) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000)).

### B.    Retaliation in Violation of First Amendment Rights

The Sixth Circuit has summarized the elements of a claim of retaliation in response to a

public employee's exercise of her First Amendment right of free speech.

        In order to make out a *prima facie* case for a First Amendment claim, [plaintiff], a public employee who claims that an employment decision was made in retaliation for engaging in protected speech, must show that: (1) "the plaintiff was engaged in constitutionally protected speech; (2) the plaintiff was subjected to an adverse action or was deprived of some benefit; and (3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action. To demonstrate that [plaintiff] was engaging in constitutionally protected speech, she must show that her speech touched on matters of public concern, and that her "interest in making such statements outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Whether speech addresses a matter of public concern is a question of law. If a plaintiff's speech does not address a matter of public concern, no further inquiry is necessary.

        The Supreme Court has held that speech addressing a matter of public concern is speech relating to "any matter of political, social, or other concern to the community." By contrast, a public employee's speech dealing with "matters only of personal interest" is generally not afforded constitutional protection. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." In general, speech involves matters of public concern when it involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." If any part of an employee's speech relating to a matter of public concern is a substantial or motivating factor in the adverse action, the court must engage in the balancing process set forth in *Pickering*. The court is required to: "balance between the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." If retaliation for protected speech was a substantial or motivating factor in Defendants' disciplinary or adverse action against [plaintiff], Defendants may present evidence that they would have taken this action in the absence of her protected conduct.

*Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892-93 (6th Cir. 2003) (quoting *Brandenburg v.*

*Housing Authority of Irvine*, 253 F.3d 891, 896 (6th Cir. 2001); *Pickering v. Board of Educ. of*

*Township High Sch., Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731 (1968); *Connick v. Myers*, 461

U.S. 138, 146, 103 S.Ct. 1684 (1983)) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,

429 U.S. 274, 287, 97 S.Ct. 568 (1977)) (other citations omitted). *See also, Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995); *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006).

The Sixth Circuit has described the burden of proof for a First Amendment retaliation claim as a three-part test:

> First, [plaintiff] must show that, as a matter of law, the speech at issue was protected. To do so, he must demonstrate both that the speech 'touches on a matter of public concern' and that 'his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer.' [The plaintiff] must next show that his termination by [his employer supervisor] "would chill an ordinary person in the exercise of his First Amendment rights." Finally, he "must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or motivating factor in the employer's decision to discipline or dismiss."

*Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 362-63 (6th Cir. 2007) (quoting *Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003)); *see also, Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999); *Scarbrough*, 470 F.3d at 255; *Sowards v. Loudon Cty., Tenn.*, 203 F.3d 426, 431 (6th Cir. 2000). "[O]nce a plaintiff shows that her constitutionally protected conduct was a substantial factor in an employment decision, the burden of persuasion shifts to the defendant to 'show[ ] by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct.'" *Sowards*, 203 F.3d at 431 n.1.

As the Supreme Court noted in *Connick*, "the key question is not whether a person is speaking in his role as an employee or a citizen, but whether the employee's speech in fact touches on a matter of public concern." *Banks*, 330 F.3d at 894 (citing *Connick*, 461 U.S. at 148-49, 103 S.Ct. 1684). The Sixth Circuit illustrated this concept in *Banks*:

> [t]he Sixth Circuit has explained that the point of the protection afforded public employees is to allow public employees a voice on issues actually affecting and

-18-

interesting the community at large. A public school district paying employees who were not qualified or who were not officially approved by council and arbitrarily paying raises to some of its employees are matters of public concern. Likewise, a school district making purchases without approval, not accounting for funds earmarked for a specific purpose, and not balancing sections of the budget would affect and interest the community taxpayers.

330 F.3d at 897 (citing *Gragg v. Kentucky Cabinet for Workforce Devel.*, 289 F.3d 958, 966 (6th Cir. 2002)). "In general, speech involves matters of public concern when it involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.' Such matters of public concern are to be contrasted with internal personnel disputes or complaints about an employer's performance." *Brandenburg*, 253 F.3d at 898 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)). However, "'public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.'" *Brandenburg*, 253 F.3d at 898 (quoting *Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986)).

The Sixth Circuit quoted the district court's description of what topics might qualify as matters of public concern in *Dambrot*:

One way to evaluate the possibility of the "public concern" component in questioned speech is to imagine it being discussed in public. The political compulsion of public employees partially at issue in *Connick, supra*, the allegations of corruption noted in *McMurphy, supra*, and comments concerning the level of fire protection in a town discussed in *Brasslett v. Cota*, 761 F.2d 827 (1st Cir. 1985), all can easily be envisioned as the subjects of heated disputation, with the contesting points of view hashing it out from soapboxes in the public square.

55 F.3d at 1188. In addition "'[c]ontroversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection.' However, the employee's entire speech does not have to focus on matters of public concern, as long as some portion of the speech does

-19-

so." *Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003) (quoting *Drambrot*, 55 F.3d at 1187 and citing *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412 (6th Cir. 1994)). Further, the court's "duty is not to discern [a plaintiff's] motive, but rather to evaluate her point as it is presented in the speech." *Rodgers*, 344 F.3d at 599.

When analyzing whether an employer's interest in an efficiently run organization outweighs the employee's interest, the Sixth Circuit has outlined the considerations a district court should take into account:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for discipline. . . . we look for evidence of the impact of the statement on the city's legitimate organizational interests.

*Brandenburg*, 253 F.3d at 899 (citing *Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir. 1991)). As the Supreme Court emphasized in *Connick*:

> We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147. Indeed, the "government need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" *Jackson v. Leighton*, 168 F.3d 903 (6th Cir. 1999) (quoting *Connick*, 461 U.S. at 151-52, 103 S.Ct. 1684). "Factors which are relevant to this balancing analysis include the manner, time, and place of the employee's expression, and the context in which the dispute arose." *Barnes v. McDowell*, 848 F.2d 725, 733 n.9 (6th Cir. 1988). In addition, "[t]he mere fact that public monies

-20-

and government efficiency are related to the subject of a public employee's speech do not, by themselves, qualify that speech as being addressed to a matter of public concern." *Barnes*, 848 F.2d at 734; *see also*, *Rahn*, 31 F.3d at 412.

Examples of personal disputes representing employee grievances that are not matters of public concern would be inappropriate distribution of an agency's budget, failure to have a 24-hour repair deadline for broken equipment, and the propriety of certain purchasing practices. *See e.g., Barnes*, 848 F.2d at 734-35. Further, employee discontent with new work rules, even if such rules might result in future implications that would affect the public, do not constitute matters of public concern. *See Rahn*, 31 F.3d at 412-413 (holding that complaints about new work rules that might contribute to employee absenteeism and possible patient endangerment in the future did not constitute comment on matters of public concern warranting First Amendment protection); *Feterle v. Chowdhury*, No. 04-3920, 2005 WL 2233609, 148 F. App'x 524, *9 (6th Cir. Sept. 14, 2005) (complaints about poor management of university and airport were not matters of public concern where complaints were directed to other employees and concerned supervisors and coworkers); *Thomson v. Scheid*, 977 F.2d 1017, 1020-1021 (6th Cir. 1992) (discussions with superiors regarding alleged fraud by a public official did not constitute speaking out on a matter of public concern, but rather related to plaintiff's duties as a fraud investigator).

In contrast, public corruption is a matter of public interest. *See Florio v. Skorepa*, No. 93-4174, 1995 WL 325711, 56 F.3d 64, *3 (6th Cir. May 30, 1995) (citing *Barnes*, 848 F.2d at 734; *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007)) (noting that "[s]tatements exposing possible corruption in a police department are exactly the type of statements that demand strong

First Amendment protections"); *Solomon v. Royal Oak Township*, 842 F.2d 862, 865-66 (6th Cir.

1988). An employee's comments suggesting possible violations of the law are "undoubtedly of

the highest public concern, since they hint at possible wrongdoing by public officials." *Leary v.

Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). In *Leary* the Sixth Circuit emphasized that "if an

employee's speech 'substantially involved matters of public concern,' an employer may be

required to make a particularly strong showing that the employee's speech interfered with

workplace functioning before taking action." 228 F.3d at 737-38 (quoting *Connick*, 461 U.S. at

150-52, 103 S.Ct. 1684). The Sixth Circuit has also expressly determined that an employee

speaks on a matter of public concern when he raises issues pertaining to a public official's

alleged nepotism and conflict of interest. *See Chappel v. Montgomery Cty. Fire Protection Dist.

No. 1*, 131 F.3d 564, 579 (6th Cir. 1997).

Speech inside an office may at times be subject to First Amendment protection. For

example, in *Garcetti v. Ceballos*, the Supreme Court noted that:

> Employees in some cases may receive First Amendment protection for
> expressions made at work. Many citizens do much of their talking inside their
> respective workplaces, and it would not serve the goal of treating public
> employees like "any member of the general public," to hold that all speech within
> the office is automatically exposed to restriction.

547 U.S. 410, 420-21, 126 U.S. 1951, 1959 (2006) (citing *Givhan v. Western Line Consol. Sch.

Dist.*, 439 U.S. 410, 414, 99 S.Ct. 693 (1979) and quoting *Pickering*, 391 U.S. at 573). In

*Givhan* the Supreme Court examined whether private speech given of teacher to a principal was

constitutionally protected. The court noted that:

> [t]his Court's decisions in *Pickering, Perry,* and *Mt. Healthy* do not support the
> conclusion that a public employee forfeits his protection against governmental
> abridgment of freedom of speech if he decides to express his views privately
> rather than publicly. While those cases each arose in the context of a public

employee's public expression, the rule to be derived from them is not dependent on that largely coincidental fact.

439 U.S. at 414, 99 S.Ct. at 695. The Court continued:

> The First Amendment forbids abridgment of the "freedom of speech." Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.

*Id.* at 415, 99 S.Ct. at 696-97. Further, it is "nondispositive" that the subject matter may be the plaintiff's employment. *Garcetti*, 547 U.S. at 421.

However, where the speech is a part of the employee's official duties, such speech is not protected by the First Amendment. *Id.* at 421-22 (deputy prosecutor's memorandum recommending dismissal of a pending criminal case was not entitled to First Amendment protection where it was his work product created as a result of his official duties); *see also, Haynes*, 474 F.3d 357 (police department dog handler's complaints regarding cuts to dog training budget were not subject to First Amendment protection). In *Garcetti* the Court concluded that the "First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." 547 U.S. at 424. As one district court phrased it, "the proper focus is on the employee's official job duties, not necessarily on the employee's motivations – whether based on perceived job duties or personal gratification." *Black v. Columbus Public Schs.*, No. 2:96cv326, 2006 U.S. Dist. LEXIS 57768 (S.D. Ohio, Aug. 17, 2006) (relying on *Garcetti*, 547 U.S. 410); *see also Pittman v. Cuyahoga Valley Career Ctr.*, 451 F.Supp.2d 905, 929 (N.D. Ohio 2006) (interpreting *Garcetti* as requiring analysis of "job relatedness" and determining that "[i]f the public employee's *speech* was required by his or her job, then *Garcetti* applies and the statements are not protected speech").

-23-

Regarding the *Pickering* balancing test, the defendant "bears the burden of demonstrating that legitimate grounds existed justifying the termination." *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008). The Sixth Circuit recently summarized the existing law regarding a defendant's justification for adverse employment action:

> In *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), a plurality of the Supreme Court stated that "[i]t is necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext," explaining that "[i]f an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with . . . the care that a reasonable manager would use before making an employment decision–discharge, suspension, reprimand, or whatever else–of the sort involved in the particular case." The plurality reasoned that such care is necessary to avoid "the possibility of inadvertently punishing someone for exercising her First Amendment rights." As with the public-concern inquiry, the "[a]pplication of the *Pickering* balancing test is a matter of law for the court to decide."

*Hughes*, 542 F.3d at 180-81 (quoting *Waters*, 511 U.S. at 677-78, 114 S.Ct. 1878).

With respect to the second prong of a First Amendment retaliation claim, adverse employment actions may include such activities as lowering an employee's salary. *See e.g.*, *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008) (reduction of salary and benefits following protected activity can constitute circumstantial evidence of causation). Termination of employment also constitutes adverse action. *See e.g., Evans v. Prospect Airport Services, Inc.*, No. 07-5303, 286 F. App'x 889, 894, 2008 WL 2604312 (6th Cir. June 27, 2008); *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996).

The final prong of causation is normally a question to be resolved by a jury, although a court may grant summary judgment regarding causation when warranted by the record. *See*

-24-

*Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).  In the employment

discrimination context, "[p]roof of temporal proximity between the protected activity and the

adverse employment action, 'coupled with other indicia of retaliatory conduct,' may give rise to

a finding of causal connection."  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quoting

*Randolph v. Ohio Dep't. of Youth Services*, 453 F.3d 724, 737 (6th Cir. 2006)) (analyzing Title

VII retaliation claim).  However, under certain circumstances, temporal proximity alone between

the protected activity and the adverse action may be enough to find a causal connection:

> Where an adverse employment action occurs very close in time after an employer
> learns of a protected activity, such temporal proximity between the events is
> significant enough to constitute evidence of a causal connection for the purposes
> of satisfying a prima facie case of retaliation.  But where some time elapses
> between when the employer learns of a protected activity and the subsequent
> adverse employment action, the employee must couple temporal proximity with
> other evidence of retaliatory conduct to establish causality.

*Mickey*, 516 F.3d at 525.

Finally, once a plaintiff has established the elements of her First Amendment claim

"summary judgment for the defendants is proper only if the evidence is such that *every*

reasonable juror would conclude that the defendants have met their burden of showing" that a

plaintiff would have been terminated even if she had not engaged in the protected activity.

*Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056-57 (6th Cir. 2001).


1.      **Defendant's Qualified Immunity for First Amendment Retaliation
        Claim**

Defendant claims that his actions are protected by the doctrine of qualified immunity.

The doctrine of qualified immunity "shields 'government officials performing discretionary

functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The U.S. Supreme Court has established a two-part test, the order of which the Court has recently relaxed, for determining whether a law enforcement officer is entitled to qualified immunity. *See Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005) (citing *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)). Under this test district courts must:

> consider whether 'the facts alleged show the officer's conduct violated a constitutional right.' . . . If the plaintiff can establish that a constitutional violation occurred, a court should ask 'whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition.'

*Lyons*, 417 F.3d at 571 (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The Supreme Court has recently receded from the strict formula described in *Saucier v. Katz* and determined that the *Saucier* "procedure should not be regarded as an inflexible requirement." *See Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 812 (2009). The Court explained that:

> [o]n reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

*Pearson*, 129 S.Ct. at 818.

A right may be defined as clearly established by looking to Supreme Court precedent, then to Sixth Circuit precedent, then to other courts within the Sixth Circuit, and finally to

decisions of other circuits. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

In addition, "[q]ualified immunity affords government officials an immunity from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Burden v. Carroll*, No. 03-2149, 108 F. App'x. 291, 293, 2004 WL 1826602 (6th Cir. Aug. 12, 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). This analysis should consider the legal rules that are clearly established at the time the defendants took the alleged actions. *See Rodgers v. Jabe*, 43 F.3d 1082, 1085 (6th Cir. 1995) (relying on *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)).

Once a defendant claims the affirmative defense of qualified immunity, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense of qualified immunity. *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (citing *Gardenhire*, 205 F.3d at 311).

According to the Sixth Circuit, as of 2001, "a public employee's right to speak on matters of public concern without facing improper government retaliation was settled: such statements are protected, even if later proven untrue, as long as they are not deliberately or recklessly false." *See*, 502 F.3d at 495; *see also Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994) (noting that "[t]he law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional, and 'retaliation claims' have been asserted in various factual scenarios"); *Chappel*, 131 F.3d at 580 (noting that "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern"). In *See* the Sixth Circuit affirmed the district court's order denying

-27-

summary judgment for the defendant on the grounds of qualified immunity. 502 F.3d at 496. As the Sixth Circuit noted many years ago, by "August 1990, the general contours of public employees' First Amendment rights were clear. As we stated previously, 'speech of a public employee is protected if (1) the speech addresses a matter of public concern, and (2) the employer has no overriding state interest in efficient public service that would be undermined by the speech.'" *Hudson v. Washington Cty., Tennessee*, No. 92-5763, 1993 WL 100093, *3 (6th Cir. Apr. 5, 1993) (quoting *Meyers v. City of Cincinnati*, 979 F.2d 1154, 1157 (6th Cir. 1992)).

Thus, this court concludes that, based upon both Sixth Circuit and Supreme Court precedent, the parameters of the First Amendment right against retaliation for raising issues of public concern have been clearly established for some time in this Circuit. The court will now address whether Plaintiff suffered a violation of her constitutional First Amendment rights.

The first part of the three-part test to determine whether Plaintiff's First Amendment rights were violated is to decide whether Plaintiff engaged in protected speech that touched on a matter of public concern. *See Haynes*, 474 F.3d at 362-63. The court concludes that, as a matter of law, portions of Plaintiff's speech, in various contexts, touched on matters of public concern. Plaintiff and Defendant both appear to agree that Plaintiff raised concerns to both Defendant personally and through her Memo about Defendant's hiring of his wife as an exempt employee and providing her with a salary regardless of whether she worked any certain number of hours. Defendant admits in his affidavit that "Ms. Rich even displayed an improper attitude and opposition to who I hired as my staff." Gobble Aff., ¶ 4. Sixth Circuit case law makes clear that allegations of public corruption, nepotism, and fraud are unquestionably issues of public importance. *See See*, 502 F.3d at 493; *Solomon*, 842 F.2d at 865-66; *Leary*, 228 F.3d at 737-38;

*Chappel*, 131 F.3d at 579.  Plaintiff raised the issue of Defendant's violation of the only written nepotism policy available to her, as well as potential violations of the FLSA with the hiring of Christie Gobble.  The regulations pertaining to exempt employees establish that to be classified as an exempt administrative employee, an individual must have a primary duty which "includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 241.200(a)(3).  It is unclear from the record what the scope of Mrs. Gobble's employment duties were; however, it is clear that she mentioned no education beyond her high school diploma and no employment experience in her employment application.  [Court Doc. No. 36-2].  Thus, Plaintiff posed legitimate questions regarding whether Mrs. Gobble's employment should have been classified as exempt pursuant to the FLSA.  *See* 29 U.S.C. § 213.  In addition, Defendant does not attempt to establish that Mrs. Gobble was working from home during times when Plaintiff alleges she was paid for hours when she was not present at the Sheriff's office.  Further, Plaintiff raises an issue of fact regarding whether Defendant mentioned to Plaintiff that he needed to hire his wife at a certain salary so that he could "supplement his income."

Plaintiff's allegations pertaining to Mrs. Gobble's employment thus raise issues of public concern.  Plaintiff addressed her concerns with Defendant directly and in her Memo submitted to Mayor Davis.  These concerns included possible violations of federal labor laws, as well as waste of taxpayer dollars in paying a salary for Mrs. Gobble for work that she did not perform.  Possible violations of federal law constitute matters of utmost public concern.  In addition, Plaintiff's allegations suggest corruption in the expenditure of public funds.  There is no suggestion that other candidates were evaluated for the position of Defendant's assistant's assistant.  Nor is there any indication that the creation of such a position was warranted.  The

-29-

record does not reveal what Mrs. Gobble's job duties were.  Therefore, Plaintiff satisfies the first requirement of her First Amendment retaliation claim.

The Plaintiff's other concerns relating to the Sheriff's use of the County budget are not matters of public concern.  Her complaints regarding his purchase of expensive and unbudgeted items, cellular telephone usage, printer usage and credit card policy violations, while legitimate employment issues, are more akin to employment and personnel related issues that are not subject to First Amendment protection.  *See Connick*, 461 U.S. at 151-52; *Barnes*, 848 F.2d at 734-35; *Rahn*, 31 F.3d at 412-13.  Thus, the court concludes that only Plaintiff's concerns regarding Defendant's hiring of Mrs. Gobble, her concerns regarding Mrs. Gobble's pay from public funds for work she did not perform, and possible FLSA violations constitute matters of public concern.

Defendant argues that it was part of Plaintiff's official duties to perform payroll and budget activities and thus her complaints regarding Mrs. Gobble's employment were job-related. He contends that the *Garcetti* exception therefore applies.  547 U.S. at 421-22.  However, Defendant's own deposition testimony indicates that it was beyond the scope of Plaintiff's employment to question management decisions and that her questioning his decisions affected his view of her job performance.  He asserts that Plaintiff had "[j]ust a general attitude of questioning legitimate management decisions regarding policy such as decisions on equipment purchases and other things that were out of the scope of her employment duties to make.  It wasn't her job to make those decisions."  Gobble Dep., pp. 103-04.  He asserted that Plaintiff's "job was the mechanics of making that type of thing happen. . . . not to question the decisions." *Id.*  Thus, the *Garcetti* job-related exception does not apply.

-30-

In addition, the court concludes that both the Memo, which detailed Plaintiff's concerns to Mayor Davis, as well as Plaintiff's general inner-office discussions with Defendant and other staff members constitutes protected speech. In *Garcetti*, the Supreme Court made clear that inner-office conversations could constitute protected speech; "[e]mployees in some cases may receive First Amendment protection for expressions made at work." *See* 547 U.S. at 420; *Givhan*, 439 U.S. at 414.

Next, this court must determine that Plaintiff's "'interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer.'" *Haynes*, 474 F.3d at 362-63 (quoting *Taylor*, 338 F.3d at 643). As noted *supra*, factors to consider in this determination include impairment of discipline by superiors, detrimental impacts on close working relationships, undermining of a legitimate goal or mission of the employer, impeding the performance of the speaker's duties, or impairing harmony among co-workers. *Brandenburg*, 253 F.3d at 899 (citing *Meyers*, 934 F.2d at 730). Defendant bears the burden of showing the justification for Plaintiff's termination and reduction in salary. *Id.* "Factors which are relevant to this balancing analysis include the manner, time, and place of the employee's expression, and the context in which the dispute arose." *Barnes*, 848 F.2d at 733 n.9. The parties dispute the amount of disruption that Plaintiff's speech caused in the workplace. Defendant asserts that Plaintiff had confrontations with staff members and created conflicts with other employees. However, much of the conflict appears to stem from concerns that Plaintiff raised regarding Mrs. Gobble's employment and her questioning of Defendant's assistant regarding Defendant's decisions. Defendant presents very little evidence that Plaintiff's actual job performance was impaired or that she was unable to complete her job duties

as a result of her speech. Defendant did not appreciate Plaintiff's "attitude," but it appears that her attitude included what Defendant thought was inappropriate questioning of his authority. The time, manner, and place of Plaintiff's speech appeared to be in the workplace at first. She did not go to the media with her concerns or seek to start a publicity frenzy that would impair the functioning of the Sheriff's office. Even when she did approach her concerns in a more public manner through her Memo to Mayor Davis, she did not release the Memo to the press or to a large number of recipients. Although Plaintiff's speech may have impaired harmony among co-workers, it appears that the disharmony may have been a result of the perceived unfairness of the way in which Defendant treated his staff. Defendant was understandably dismayed that Plaintiff questioned his wife's employment; however, there is not enough evidence of actual office disruption and inefficiencies caused by Plaintiff to outweigh Plaintiff's interest in exposing possible illegal activity and misuse of public funds. Thus, Defendant has not sustained his burden of proof of making a particularly strong showing that Plaintiff's speech interfered with workplace functioning in applying the *Pickering* balancing test. *See Leary*, 228 F.3d at 737-38.

The facts of this case contrast with the situation present in *Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001). There, the evidence demonstrated the employer's interests in maintaining public funding, protecting student confidentiality, maintaining an atmosphere free of sexual harassment, and protecting students from retaliation for raising concerns outweighed Plaintiff's interests in academic freedom. *Id.* at 822-24.

In this case, there is no evidence that Plaintiff threatened the funding of the Sheriff's office, caused undue media attention that distracted from the functions of the office or failed to perform her job. Mrs. Gobble and Defendant's assistant may have disliked Plaintiff, but it is

unclear that Plaintiff was universally disliked by other employees.  Further, there are no negative

performance evaluations in the record pointing to concrete problems with Plaintiff's

performance.  It appears that Plaintiff attempted to raise her concerns in an appropriate manner,

by going directly to Defendant first before raising her concerns to the Mayor.  In short, there is

not enough evidence of the impact of Plaintiff's speech on the legitimate organizational interests

of the Sheriff's office to outweigh Plaintiff's First Amendment rights.  *See Brandenburg*, 253

F.3d at 899.

Next, the court finds that Plaintiff suffered an adverse action in both her transfer and

reduction in pay and in her ultimate termination.  *See Kocsis*, 97 F.3d at 886.  A large reduction

in pay, as well as termination from employment serves to chill protected speech.

Finally, the plaintiff must demonstrate that the speech was a motivating factor in the

employer's decision.  The parties dispute whether Defendant knew about the Memo prior to his

termination of Plaintiff's employment.  Defendant has moved to strike the affidavits of Brenda

Davis and Dennis Davis, claiming that their testimony that Defendant knew about the Memo

prior to Plaintiff's termination constitutes hearsay.  [Court Doc. Nos. 41, 42].  It is not entirely

clear from the factual record that Federal Rule of Evidence 801(d)(2)(D) does not apply to the

statements made by Mr. and Ms. Davis.  However, the court determines that it does not have to

resolve whether Defendant knew about the Memo prior to terminating Plaintiff.  Therefore, the

court will **GRANT** Defendant's motions to strike the Davis affidavits and will not rely on the

statements made in those affidavits.

Even without the Davis' affidavits, the court concludes that there is evidence to suggest

that Defendant was motivated to terminate Plaintiff and reduce her salary because of her

protected speech. Plaintiff's protected speech includes both her Memo, as well as speech she made to Defendant personally regarding her concerns about his wife's employment. There is some evidence that Defendant's retaliatory actions were in response, at least in part, to her questioning of his decisions, including his decision to employ his wife. He admits in his affidavit that he "began to have problems with Ms. Rich questioning my management decisions." Gobble Aff., ¶ 4. She "even displayed an improper attitude and opposition to who I hired as my staff." *Id.* Thus, the question of causation does not turn in this case on when Defendant knew about the Memo. The parties agree that Plaintiff spoke with Defendant about her concerns with Mrs. Gobble's employment. The law is clear, and has been for some time at least since *Givhan*, that speech does not have to be made in a public setting to constitute protected speech. *See Garcetti*, 547 U.S. at 420-21; *Givhan*, 439 U.S. at 414. Defendant asserts that he would have made the decision to terminate Plaintiff even if he had known about the Memo, due to her insubordination and her comments to Agent Jackson. Part of Defendant's concerns about insubordination, however, relate to Plaintiff's decision to question his authority, especially to question how he treated his wife and his assistant and his decision to hire his wife. Thus, there is a genuine issue of fact regarding whether Defendant was motivated to reduce Plaintiff's salary, transfer her, and ultimately terminate her because of the attention she was bringing to his alleged misuse of public funds, violation of Bradley County nepotism policy, and possible violations of the FLSA. The court therefore finds that Plaintiff has established the elements of her First Amendment retaliation claim.

Although Defendant states that he would have terminated Plaintiff anyway even if he had known about the Memo, it is not clear that his decisions did not relate, at least in part, to

Plaintiff's questioning his decisions relating to his wife's employment. Therefore, this court cannot say that "the evidence is such that *every* reasonable juror would conclude that the defendant[] ha[s] met [his] burden of showing" that the Plaintiff would have been terminated even if she had not engaged in the protected activity. *Cockrel*, 270 F.3d at 1056-57. Therefore, summary judgment for Defendant on the basis of qualified immunity is not appropriate. The law pertaining to First Amendment retaliation claims has been well-settled based on Supreme Court and Sixth Circuit precedent for some time. Defendant's motion for summary judgment on the basis of qualified immunity will thus be **DENIED**.

### 2. Municipal Liability

The U.S. Supreme Court has held that municipalities are included as persons within the meaning of Section 1983, and therefore plaintiffs may sue municipalities for relief under the statute. *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a municipality may not be held liable under Section 1983 under a theory of respondeat superior. *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 691). Municipalities are only liable under Section 1983 if they have an established policy or custom that causes the alleged injury. *See Monell*, 436 U.S. at 690.

> A municipality may be held liable only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.' Furthermore, for municipal liability, there must be an 'affirmative link between the policy and the particular constitutional violation alleged.' The claimant has the burden of proof for establishing the existence of an unconstitutional policy and demonstrating the link between the policy and the alleged injuries at issue.

*Bennett*, 410 F.3d at 818-19 (quotations and citations omitted). Plaintiffs must prove that their particular injuries were "incurred because of the execution of the policy or custom."

*Cunningham*, 2003 WL 23471541 at *14 (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997); *Gregory*, 220 F.3d at 442; *Doe v. Claiborne County, Tennessee*, 103 F.3d 495 (6th Cir. 1996)).

To establish municipal liability, a plaintiff must:

(1) identify a municipal policy; (2) establish that the municipality is responsible for promulgating the policy; and (3) show that execution of the policy caused the injury of which the plaintiff has complained.

*Hilliard v. Walker's Party Store, Inc.*, 903 F.Supp. 1162, 1178-79 (E.D. Mich. 1995).

This court has noted that a custom must " 'be so permanent and well settled as to constitute a custom or usage with the force of law.' " *Cunningham*, 2003 WL 23471541 at *14 (quoting *Monell*, 436 U.S. at 691). A plaintiff may establish a policy or custom in several ways. There may be an official policy that defendant promulgated. *Id.* Plaintiffs may also show a "pervasive custom or practice of which the [ ] lawmakers either know or reasonably should know." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)); *see also*, *Hilliard*, 903 F.Supp. at 1179. Such a custom must be "so widespread and commonly accepted as to in effect have the force of law." *Cunningham*, 2003 WL 23471541 at *14 (citing *Brown*, 520 U.S. at 404; *Monell*, 436 U.S. at 690-91). Plaintiffs can also establish the requisite policy or custom for purposes of Section 1983 by demonstrating that an official with policymaking authority has taken a single act relating to the subject matter or area at issue. *Cunningham*, 2003 WL 23471541 at *14 (citing *City of St. Louis v. Paprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cinncinnati*, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

The parties have failed to provide any legal briefing on the issue of municipal liability in

this case. Parties generally waive issues in district court when they are raised for the first time in motions for reconsideration or in reply briefs. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). In this matter, the parties have failed to provide any legal analysis of the reasons or lack of reasons for the dismissal of claims against Defendant in his official capacity. Therefore, the court will **RESERVE** ruling on the dismissal of Plaintiff's First Amendment retaliation claims against the Defendant in his official capacity.

C.      **State Law Retaliation Claims**

Plaintiff has also brought claims against Defendant individually and in his official capacity under Tennessee law for retaliatory discharge pursuant to Tennessee's whistleblower statute, Tenn. Code Ann. § 50-1-304, and common law. The Defendant requests that this court decline to exercise supplemental jurisdiction over the remaining state law causes of action, without provide any legal briefing regarding the issue. Although declining supplemental jurisdiction may be appropriate where this court has dismissed the federal claims against the Defendant, *see Whitsett v. City of Etowah*, No. 1:07cv117, 2008 WL 4510326 (E.D. Tenn. Sept. 30, 2008), it is not entirely clear that such a result serves the interest of judicial economy when this court does not dismiss the federal claims, especially with respect to the retaliation claims against Defendant individually. Because the parties have failed to address the state law retaliation claims against Defendant individually or in his official capacity, this court will **RESERVE** ruling regarding these claims at this time.

C.      **Ancillary Motions**

1.      **Plaintiff's Motion to File Overlength Brief**

As stated *supra*, the court will **GRANT** Plaintiff's motion to file her response brief in

-37-

excess of twenty-five pages. [Court Doc. No. 37].

## 2. Defendant's Motion to Strike Plaintiff's Affidavit

Defendant moves to strike portions of Plaintiff's Affidavit, as well as the exhibits attached thereto. [Court Doc. No. 39]. This court finds that Plaintiff's attachments, such as Defendant's wife's application for employment, Bradley County's anti-nepotism policy, and the State Auditor's Report, is appropriate evidence for this court to rely upon for summary judgment purposes because it is evidence that could be authenticated and admitted at trial. Fed. R. Civ. P. 56.

During discovery, Plaintiff responded to interrogatories that she did not have any conversations with F.B.I. Agent Wayne Jackson "to her knowledge." [Court Doc. No. 39-1, pp. 11-12]. She further testified in her deposition that she did not "remember any conversations" with Agent Jackson around the time she was terminated from employment. Rich Dep., p. 180. However, following Agent Jackson's deposition, Plaintiff asserts that she was provided with more context of the alleged conversation and was able to recall the conversation in greater detail. [Court Doc. No. 50-2, Plaintiff's Second Affidavit ("2nd Rich Aff.")]. Plaintiff asserts that although she did not remember the conversation with Agent Jackson when asked about it in discovery, her presence at his deposition triggered her memory:

> On February 16, 2009, I was present at the deposition of Jackson. In his deposition, he supplied details which had not been supplied to me before. He said the conversation was in late February, 2007, at lunchtime at Qdoba Grill and he was with Robert Chester. That triggered my memory and I did remember the conversation after I was given those details. Without those details, I had no remembrance of the conversation.

2nd Rich Aff., ¶ 2.

Defendant moves to strike Plaintiff's Affidavit, in part, because he asserts that her

recollection of the conversation with Agent Jackson contradicts her deposition testimony and her responses to interrogatories. It is true that a party may not rely on an affidavit that contradicts prior deposition testimony in support of an opposition to summary judgment. *See Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997). However, as Plaintiff points out, her affidavit does not directly contradict her deposition testimony in which she indicated she did not recall any conversations with Agent Jackson. Plaintiff's recollection has been refreshed after sitting in on both Defendant's and Agent Jackson's deposition, and the parties appear to agree that Plaintiff did indeed have a conversation with Agent Jackson prior to her termination from employment. Defendant seeks to rely on the existence of the conversation as justification for Plaintiff's termination, so it seems incongruous to require Plaintiff to assume the conversation never occurred. In addition, Agent Jackson himself recalls the conversation. It is the substance of the conversation that is in dispute. For this reason, the court will **DENY** Defendant's motion to strike Plaintiff's affidavit regarding her conversation with Agent Jackson.

The court will further **DENY** Defendant's motion to strike the other portions of Plaintiff's affidavit. The affidavit asserts specific facts relating to Plaintiff's employment, including facts of which Plaintiff would have personal knowledge. As for the newspaper article from the Bradley News, the court finds that this article is not hearsay because it is not offered for the truth of the matter asserted. Instead, it is offered to indicate that the Sheriff's use of County credit cards was a matter of public interest. For these reasons, this court will **DENY** Defendant's motion to strike Plaintiff's affidavit and attached exhibits. [Court Doc. No. 39].

3.  **Defendant's Motion to Strike the Affidavits of Brenda Davis and Dennis Davis**

Defendant has moved to strike portions of the affidavits of both Brenda Davis and Dennis

-39-

Davis. [Court Doc. Nos. 40, 41]. Defendant asserts that both affiants rely on hearsay in the affidavits that would be inadmissible in court and are therefore inappropriate for this court to consider on summary judgment. As this court noted, *supra*, it is possible that the statements by Defendant's assistant and the Chief Deputy are statements which are not hearsay pursuant to Fed. R. Evid. 801(d)(2)(D). That rule provides that a statement is not hearsay if it is a statement "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." *Id.*

This court does not need to resolve this issue at this juncture because it does not need to rely upon the statements of Mr. and Ms. Davis in making its ruling on summary judgment. Therefore, the court will **GRANT** Defendant's motion to strike the affidavits of Mr. Davis and Ms. Davis. [Court Doc. Nos. 40, 41]. However, the court makes no ruling regarding whether the testimony of Mr. Davis and Ms. Davis would be admissible in court were they to testify regarding the matters expressed in their affidavits. Any objections to such proposed testimony at trial will be addressed at that time.

###    4.    Motions for Leave to File Motion to Dismiss and Amended Answer and Motion to Amend the Complaint

The court concludes that Defendant's motion for leave to file a motion to dismiss and for leave to file an amended answer, as well as Plaintiff's motion to amend the complaint are all inter-related. [Court Doc. Nos. 42, 43, 52]. Therefore, this court will address them together.

Defendant moves for leave to file a motion to dismiss, claiming that Plaintiff's assertion that her conversation with F.B.I. Agent Wayne Jackson constitutes protected speech is a new claim. His theory is that this new claim is time-barred by the statute of limitations. He therefore

seeks to amend his answer to add the affirmative defense of statute of limitations, and he seeks to file a motion to dismiss the "new" claim on the grounds that it is time-barred. The court concludes that Plaintiff's conversation with Agent Jackson is simply a part of her overall First Amendment retaliation claim. Federal Rule of Civil Procedure 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The rule does not require detailed descriptions of every relevant conversation or factual scenario that relates to the plaintiff's overall claim. *See Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197 (2007) (noting that Rule 8 "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, __, 127 S.Ct. 1955, 1964 (2007)).

Plaintiff's conversation with Agent Jackson does not change the overall nature of her claims – claims for First Amendment retaliation and state law retaliatory discharge. She does not seek to add a new legal theory by alleging she had a protected conversation with Agent Jackson. Nor does the addition of the alleged conversation with Agent Jackson prejudice Defendant. As Plaintiff notes, she did not remember any conversation with Agent Jackson until Defendant informed her in his deposition that he relied on the conversation with Agent Jackson to make the decision to terminate Plaintiff. Plaintiff then listened to Agent Jackson recall his conversation with her. It stands to reason that Plaintiff had her recollection of the conversation with Jackson recalled when it was retold to her in vivid detail on two separate occasions and was explained that such conversation was a major reason for her termination. It would defy logic to allow Defendant to rely upon the alleged conversation with Jackson as a reason for terminating

-41-

Plaintiff, but force Plaintiff to pretend the conversation never occurred.

Even if the conversation with Jackson constitutes a new claim, such a claim relates back to the original claim pursuant to Federal Rule of Evidence 15(c). As one district court in this Circuit explained:

> The effect of this rule is that "once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading." The rationale behind Rule 15(c) is to allow an amendment to relate back to the filing of the original complaint where the defendant has been put on notice, through the pleadings or from other sources, of the entire scope of the transaction or occurrence out of which the amended claims arise. Thus, "amendments that merely correct technical deficiencies or expand or modify the facts alleged in the earlier pleading meet the Rule 15(c) test and will relate back . . . . [A]mendments that do no more than restate the original claim with greater particularity or amplify the details of the transaction alleged in the preceding pleading fall within Rule 15(c)."

*Barcume v. City of Flint*, 819 F.Supp. 631, 636 (E.D. Mich. 1993) (quoting Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D §§ 1496, 1497 (1990) at 64, 74-79). It is clear that Defendant has not been surprised or prejudiced by Plaintiff's raising the issue of her conversation with Jackson because Defendant is the one who brought the conversation to her attention. The court concludes that Defendant's alleged actions against Plaintiff based on her conversation with Jackson are related to the ongoing allegations of First Amendment retaliation that Plaintiff claims Defendant took against her. Therefore, any claim arising out of the conversation with Jackson is not barred by the statute of limitations.

This court does not make a ruling on whether Plaintiff's conversation with Jackson was indeed protected speech. The parties appear to dispute the nature of what Plaintiff said to Jackson, and it is unclear if Plaintiff specifically raised the impropriety of Christie Gobble's

employment with Agent Jackson. However, this court's ruling on summary judgment does not turn on whether the conversation with Jackson was protected speech as the court has already found enough evidence that Plaintiff's other protected speech may have constituted a motivating factor in her termination.

Therefore, although it does not find that Plaintiff's conversation with Agent Jackson constitutes a new claim, it will **GRANT** Plaintiff's motion to amend her complaint to clarify any confusion regarding the issue. [Court Doc. No. 52]. The court will **DENY** Defendant leave to file a motion to dismiss on statute of limitations grounds and will **DENY** Defendant leave to amend his answer. [Court Doc. Nos. 42, 43].

###    IV.    Conclusion

For the reasons stated, *supra*, Defendant's motion for summary judgment will be **DENIED**. [Court Doc. No. 31]. Defendant's motion to strike Plaintiff's affidavit will be **DENIED**. [Court Doc. No. 39]. Defendant's motion to strike Brenda Davis' affidavit will be **GRANTED**. [Court Doc. No. 40]. Defendant's motion to strike the affidavit of Dennis Davis will be **GRANTED**. [Court Doc. No. 41]. Defendant's motions for leave to file an amended answer and a motion to dismiss will be **DENIED**. [Court Doc. Nos. 42, 43]. Plaintiff's motion to amend her complaint will be **GRANTED**. [Court Doc. No. 52].

A separate order will enter.


            */s/ R. Allan Edgar*
            R. ALLAN EDGAR
            UNITED STATES DISTRICT JUDGE